UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

MAURICE A. CHINNERY,                                :

                          Plaintiff,          :

           - against -          :

NEW YORK STATE OFFICE OF CHILDREN        :
AND FAMILY SERVICES and ROGER
RASCOE, Facility Director,                               :

                   Defendants.          :

------------------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/25/14
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
DEBORAH A. BATTS**

10 Civ. 882 (DAB) (FM)

**FRANK MAAS**, United States Magistrate Judge.

          Pro se plaintiff Maurice Chinnery ("Chinnery"), an African-American man

formerly employed as a Youth Division Aide at the New York State Office of Children

and Family Services ("OCFS"), brings this action alleging that OCFS discriminated

against him on the basis of his race and gender and later retaliated against him.  Chinnery

seeks relief for these alleged wrongs under Title VII of the Civil Rights Act of 1964

("Title VII").[1]

          OCFS has moved for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  (ECF No. 71).  For the reasons set forth below, that motion

should be granted.

---

[1]      Chinnery's companion claims under the New York State Human Rights Law
previously were dismissed on election of remedies grounds.  (See ECF Nos. 31, 50).

I.      Factual and Procedural Background

        A.      Local Civil Rule 56.1

                When a party seeks summary judgment under Rule 56 of the Federal Rules

of Civil Procedure, Local Civil Rule 56.1(a) requires the party to submit "a separate, short

and concise statement, in numbered paragraphs, of the material facts as to which the

moving party contends there is no genuine issue to be tried."  The nonmoving party then

must provide a counterstatement with "correspondingly numbered paragraph[s]" setting

forth a response to each of the paragraphs in the moving party's statement.  See Local

Civil Rule 56.1(b).  When the plaintiff is proceeding pro se, Local Civil Rule 56.1

requires the movant to serve a notice advising the plaintiff, among other things, about the

rule's requirements.

                Although OCFS served Chinnery with the required notice, (ECF No. 74),

Chinnery did not submit any counterstatement.  Ordinarily, a failure to respond to facts

set forth in the movant's Rule 56.1 statement results in those facts being deemed

admitted.  Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003).  As the Second

Circuit has emphasized, however, pro se litigants are entitled to "special

solicitude . . . when confronted with motions for summary judgment."  Graham v.

Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) (citing Sellers v. M.C. Floor Crafters, Inc.,

842 F.2d 639, 642 (2d Cir. 1988)).  For that reason, notwithstanding a pro se plaintiff's

failure to comply strictly with the Local Rules, the Court "retains some discretion to

consider the substance of the plaintiff's arguments, where actually supported by

evidentiary submissions." <u>Wali v. One Source Co.</u>, 678 F. Supp. 2d 170, 178 (S.D.N.Y.

2009); <u>see also</u> <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 73 (2d Cir. 2001) (court has

"broad discretion to determine whether to overlook a party's failure to comply with the

local rules").  I therefore have considered Chinnery's factual contentions to the extent that

they are supported by the record.

B.     <u>Relevant Facts</u>[2]

1.     <u>OCFS Policies and Procedures</u>

OCFS is a New York State agency that provides services for children,

families, and other vulnerable populations.  In furtherance of its mission, OCFS operates

a number of residential facilities for juveniles who have been placed in the agency's

custody by family and criminal courts.  (Rascoe Decl. ¶¶ 4, 5).

On January 24, 2002, OCFS hired Chinnery to work as a "Youth Division

Aide" in its Goshen Secure Center ("Goshen"), a residential facility that houses juvenile

violent offenders who have been convicted and sentenced as adults.  (Ex. 6 at 1).  As a

---

[2]     The factual recitations in this Report and Recommendation are derived
principally from Chinnery's complaint, OCFS' Rule 56.1 statement, the declarations annexed to
OCFS' motion papers, and Chinnery's response to OCFS' motion.  (<u>See</u> Complaint (ECF No. 2)
("Compl."); OCFS' Rule 56.1 Statement of Material Facts (ECF No. 74) ("Def.'s Stmt.");
Declaration of Helena Lynch, Esq., sworn to on Jan. 17, 2014 (ECF No. 75) ("Lynch Decl.");
Declaration of James Barron, sworn to on Jan. 16, 2014 (ECF No. 76) ("Barron Decl.");
Declaration of Roger Rascoe, sworn to on Jan. 16, 2014 (ECF No. 77) ("Rascoe Decl.");
Declaration of Bobby Ray Smith, sworn to on Jan. 16, 2014 (ECF No. 78) ("Smith Decl.");
Plaintiff's Response to the Motion for Summary Judgment (ECF No. 83) ("Pl.'s Opp.")).  "Ex."
refers to the exhibits annexed to the Lynch Decl.  "Dep." refers to Chinnery's deposition, taken
on May 30, 2013.  (Ex. 39).  Unless otherwise noted, the facts are set forth in the light most
favorable to Chinnery.

Youth Division Aide, Chinnery was responsible for maintaining a safe and secure environment for Goshen's residents.  (Rascoe Decl. ¶ 15; Dep. at 18 (conceding that the security and safety of Goshen residents is of the "[u]tmost importan[ce]")).  Between January and June 2006, Chinnery was assigned to work the overnight shift, which ran from 10:30 p.m. to 6:30 a.m.

One of Chinnery's main duties during the overnight shift was to perform a head count throughout his assigned residential wing every thirty minutes, and then to make a "census call" to Goshen's Communication Center to confirm that he could account for all the residents' whereabouts.  When making these census calls, Youth Division Aides are instructed to leave a voicemail on a designated answering machine including their name, their assigned wing, the time, and the number of residents observed. (Smith Decl. ¶ 27).  This procedure helps ensure the safety of Goshen residents and staff members.  (Rascoe Decl. ¶ 21).

These census calls are logged daily in Goshen's "Census Call Logs." Goshen staff members use the call logs to generate periodic "Missed Census Call Lists," which specify any calls that a Youth Division Aide missed over a particular time period. (Smith Decl. ¶ 28-29).

Youth Division Aides and other unionized employees at OCFS are protected by a collective bargaining agreement that sets forth a set of "progressive" disciplinary policies and procedures to be followed in the event that they fail to meet the requirements of their jobs, such as failing to make required visual checks and census

calls.  (Barron Decl. ¶¶ 7-12, 18; Ex. 9).  After the first instance of misconduct, an employee receives informal verbal counseling from supervisory staff.  On the second occasion, the employee receives a formal counseling memorandum from the employee's direct supervisor.  After three instances of misconduct, OCFS may pursue formal disciplinary charges against the employee.  Finally, after the fourth instance of misconduct, an errant employee may be administratively removed from the overnight shift, if that was the employee's regular shift, or permanently barred from working overtime on the overnight shift if that was not the employee's regular shift.  (Id.)  These specific procedures were set forth in a memorandum to all Youth Division Aides, dated June 30, 2004, approximately two and one-half years after Chinnery began working at Goshen.  (See Compl. at 6).

OCFS supervisors considering formal disciplinary action often conduct their own investigations into alleged misconduct, and may then prepare written reports including all relevant counseling memoranda and performance appraisals.  Before actually taking any disciplinary action, however, OCFS supervisors must obtain approval from both the Deputy Commissioner of OCFS' Division of Juvenile Justice and Opportunities for Youth and the OCFS Bureau of Labor Relations.  Once the Bureau of Labor Relations has reviewed the allegations, it makes a determination as to whether discipline is warranted and what the appropriate recommended penalty should be, taking into account the employee's work record and the penalties that have been imposed for similar misconduct in the past.  (Barron Decl. ¶¶ 20-26).

5

If the Bureau of Labor Relations determines that discipline is warranted, it prepares and forwards to the employee's supervisor a "Notice of Discipline" outlining the proposed disciplinary action.  The supervisor then is responsible for serving the Notice of Discipline on the employee.  Upon receipt of the Notice of Discipline, the employee may (a) accept the penalty, (b) oppose the penalty by submitting a Grievance Form to the Bureau of Labor Relations within fourteen days of service of the Notice of Discipline, or (c) waive his right to agency-level review and request arbitration.  If the employee objects, OCFS will not impose a penalty until an arbitrator reaches a decision or the employee and the agency arrive at a settlement.  If the employee does not object within the designated time frame, the supervisor may impose the recommended penalty.  (Id. ¶¶ 28-35).

### 2. Chinnery's Alleged Misconduct

According to OCFS, Chinnery missed more than one hundred census calls from January to June 2006, while he was assigned to the overnight shift.  (Rascoe Decl. ¶ 23; Exs. 10-11).  During that time period, Roger Rascoe ("Rascoe"), the Goshen Facility Director, and several other supervisors counseled Chinnery, both orally and in writing, that he was required to make census calls every half hour, and that the agency would take disciplinary action if he continued to shirk that responsibility.  (Rascoe Decl. ¶ 24).  On June 8, 2006, after a prolonged period of continued misconduct, OCFS notified Chinnery that he would be removed from the overnight shift and reassigned to the 6:30 a.m. to 2:30 p.m. shift.  As OCFS explained, Chinnery's failure to make the required

6

census calls was a "serious infraction of basic security procedures" that could no longer be tolerated.  (Ex. 10).

In early 2007, Rascoe decided to give Chinnery a second chance and returned him to the overnight shift.  (Rascoe Decl. ¶ 29).  Despite the previous disciplinary action, Chinnery continued to miss census calls on a regular basis.  From February through July 2007, Chinnery missed a total of one hundred thirty-eight census calls:  seven calls in February, twenty in March, twenty-nine in April, forty-six in May, and thirty-six in June.  (Ex. 12).  Chinnery again was warned during a re-certification evaluation that he would need to "address his failure to consistently make census calls on the overnight shift," since it "relate[d] directly to the safety of his resident population." (Id.).  Although his attendance also was a concern, his supervisor described the failure to make census calls as the "most serious issue."  (Id.).

In July 2007, after consulting with Rascoe, Goshen's Assistant Facility Director Bobby Ray Smith ("Smith") requested that the Bureau of Labor Relations issue a formal Notice of Discipline to Chinnery and assess a $500 penalty against him for his repeated failure to make required census calls during the first half of 2007.  (Smith Decl. ¶¶ 40-41).  In connection with Smith's request, OCFS opened its own investigation into Chinnery's conduct.  (Ex. 13).

The Bureau of Labor Relations ultimately granted Smith's request, and, on September 18, 2007, a Goshen supervisor served Chinnery with a Notice of Discipline indicating that OCFS proposed to suspend him without pay for thirty days for failing to

7

make the required census calls  (Ex. 14 ("2007 Notice of Discipline")).  Chinnery did not

file a Grievance Form or request arbitration in connection with that Notice of Discipline.

(Rascoe Decl. ¶ 35; Smith Decl. ¶ 45).  Accordingly, after the time to do so expired,

Rascoe notified Chinnery that his suspension would begin on December 28, 2007.  (Ex.

15; Ex. 9 at 6).

   A few days after receiving notice of his suspension, Chinnery went to

OCFS' Office of Equal Opportunity and Diversity Development ("EODD") to file a

complaint alleging that the agency's "excessive" disciplinary action was an act of race

and gender discrimination.  (Compl. at 22).  Four days later, on January 3, 2008,

Chinnery returned to EODD intending to file an additional racial discrimination charge

against Rascoe.  While he was at EODD, however, a representative of the Bureau of

Labor Relations advised Chinnery to delay the submission of his complaint because

"there was an ongoing investigation."  (Id.).

   Later that evening, Chinnery received a voicemail from Rascoe regarding

his suspension.  (Id.).  According to OCFS, in the days following the start of Chinnery's

suspension, representatives from Goshen and Chinnery's union engaged in discussions

that led the Bureau of Labor Relations to clear Chinnery to return to work.  (Def.'s Stmt.

¶ 68).  Once OCFS received notice of Chinnery's clearance, Rascoe apparently called

Chinnery and left him a message indicating that he could return to work at Goshen.

(Compl. at 21).

Chinnery contends that he returned Rascoe's phone call the next morning. During that conversation, Rascoe told Chinnery that he still had some concerns about Chinnery's work performance, despite Chinnery's clearance by the Bureau of Labor Relations.  When Chinnery asked when he could return to work, Rascoe stated that he would have to make a few phone calls before he responded.  (Id.).

Approximately fifteen minutes later, Rascoe's assistant telephoned Chinnery to say that he should return to work that evening, January 4, for his regular overnight shift.  (Id.).  Chinnery also was told that he would be paid for the days that he did not work due to his suspension.  (Id.).  Chinnery arrived at Goshen that evening, ready to return to work.  When he approached the facility gate, however, a Goshen Control Center staff member informed him that Rascoe would not permit him on the premises without an administrator escort.  The Goshen Control Center contacted the administrator on duty, but Chinnery did not receive clearance to enter the facility, and eventually returned home.  (Id.).

Chinnery called Goshen again the next morning and asked to speak with the administrator on duty.  After speaking with Rascoe, the administrator informed Chinnery that he had received the necessary clearance and could return to work that evening.  (Id. at 22).

Chinnery returned to the overnight shift the next day, January 5, 2008.  (Id.).  According to Chinnery, he made all of the required census calls over the next two nights; however, when he called the Control Center to confirm that the calls had been

9

logged, the Control Center informed him that at least two – the 4:00 a.m. and the 4:30

a.m. calls – did not appear in the system.  (Id.).

Several months later, on May 8, 2008, Chinnery received a second Notice

of Discipline, which related to Chinnery's work performance during the second half of

2007.  (Ex. 20 ("2008 Notice of Discipline")).  According to the notice, Chinnery failed

to make over one hundred and seventy census calls from July 18 to December 31, 2007.

(Id.).  The 2008 Notice of Discipline subsequently was amended to include the period

beginning June 6, 2007,[3] which brought the number of missed census calls during the

second half of 2007 to more than two hundred.  (Ex. 21).  As a consequence of this

unsatisfactory performance, OCFS proposed to terminate Chinnery's employment.  (Id.).

Upon receiving this second Notice of Discipline, Chinnery filed a

Grievance Form objecting to the charges.  (See Ex. 22).  Chinnery's termination thus was

put on hold until the grievance process concluded.  During the pendency of the grievance

proceedings, Chinnery took a short period of worker's compensation leave after being

assaulted on the job on September 1, 2010.  Chinnery alleges that when he returned from

---

[3]       The amended 2008 Notice of Discipline was intended to fill the time gap between
June 26, 2007, when the coverage of the 2007 Notice of Discipline ended, and July 18, 2007,
when the original 2008 Notice of Discipline began.  (Smith Decl. ¶ 54, 56).  Due to an
administrative error, the amended 2008 Notice of Discipline actually addressed the period
beginning on June 6, rather than June 27, 2007, (Smith Decl. ¶ 54), and thus included thirty-four
missed calls covered by the 2007 Notice of Discipline.  OCFS' call logs indicate that from June
27 to December 31, 2007 (the time period that apparently should have been covered by the
amended 2008 Notice of Discipline), Chinnery missed more than one hundred and ninety census
calls.  (Id.; Exs. 31-36).  The overlapping coverage of the two Notices of Discipline is
immaterial for purposes of the present motion.  Accordingly, I will refer to both the original and
the amended 2008 Notices of Discipline as the "2008 Notice of Discipline."

that leave, he was removed from the 10:30 p.m. to 6:30 a.m. shift, and reassigned to work the 2:30 p.m. to 10:30 p.m. shift.  (See Ex. 3; Pl.'s Opp. at 1).  The 2008 Notice of Discipline ultimately was upheld on appeal in 2010, but by that time, Chinnery had begun a second period of worker's compensation leave.  Because Chinnery had taken medical leave, OCFS did not take any disciplinary action at that time.  (Smith Decl. ¶ 59).

Chinnery's leave benefits expired on September 3, 2012.  By that date, Chinnery had taken two years of leave related to his injury on September 1, 2010.  (Ex. 3).  Chinnery did not apply to be restored to duty before his benefits expired.  (Smith Decl. ¶ 60).  As a result, OCFS terminated Chinnery's employment pursuant to Section 71 of the New York Civil Service Law.  (See Ex. 3; Ex. 4).  Chinnery subsequently applied for permanent disability retirement benefits, which application was approved on September 13, 2012.  (Ex. 5).

C.    Chinnery's Administrative Complaints

Chinnery filed two administrative complaints raising race and gender discrimination claims.  He first filed a complaint with EODD on January 8, 2008, shortly after OCFS proposed that he be suspended from his position based on the misconduct outlined in the 2007 Notice of Discipline.  In his EODD complaint, Chinnery alleged that Rascoe had discriminated against him "by providing unequal treatment . . . in disciplinary actions" and had "singled [him] out and targeted" him for missing census calls.  (Compl. at 21).

11

On May 22, 2008, shortly after the 2008 Notice of Discipline originally was issued, but before it was amended, Chinnery filed a complaint with the New York State Division of Human Rights ("Division of Human Rights") and the federal Equal Employment Opportunity Commission ("EEOC").  (Ex. 24; Compl. at 11-16).  Chinnery alleged that OCFS had discriminated against him on the basis of his race and gender.  On March 26, 2009, the Division of Human Rights dismissed Chinnery's complaint because it found no probable cause to support his claims.  (Compl. at 17-18).  Several months later, on September 24, 2009, the EEOC sent Chinnery a right-to-sue letter indicating that it had adopted the findings of the Division of Human Rights and likewise had dismissed Chinnery's complaint.  (Id. at 5).

D.    This Action

Chinnery commenced this action against OCFS and Rascoe on December 22, 2009.  (ECF No. 2).  By order dated November 5, 2012, Your Honor granted OCFS' motion to dismiss Chinnery's state law claims, but permitted the Title VII claims to proceed.  (ECF No. 50).  Then, by order dated July 10, 2013, Your Honor adopted a Report and Recommendation by Magistrate Judge Yanthis and further dismissed all claims against Rascoe inasmuch as individuals cannot be held liable under Title VII. (ECF Nos. 63, 64).

Following Judge Yanthis' retirement, this case was referred to me to report and recommend with respect to any remaining dispositive motions.  OCFS then filed its motion for summary judgment on January 17, 2014.  (ECF No. 71).  Chinnery filed

12

opposition papers on February 7, 2014, and OCFS filed reply papers on February 21, 2014. (ECF Nos. 83, 84). The motion therefore is fully submitted.

II.     Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law" based on supporting materials in the record. Fed. R. Civ. P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002) (quoting Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996)). To defeat a properly supported motion for summary judgment, however, the nonmoving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the party opposing summary judgment must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256; see

also <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party cannot simply rely on "conclusory allegations or unsubstantiated speculation").

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court.  <u>Fischl v. Armitage</u>, 128 F.3d 50, 55 (2d Cir. 1997).  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  <u>Id.</u> at 55.

The Second Circuit has emphasized that "trial courts must be especially chary" when considering summary judgment motions in discrimination cases, because "the employer's intent is ordinarily at issue" in such cases.  <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996).  Nevertheless, "[e]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotations and citations omitted).

Although the same summary judgment rules apply to a party proceeding <u>pro se</u>, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded. <u>See</u> <u>Milano v. Astrue</u>, No. 05 Civ. 6527 (KMW) (DCF), 2009 WL 1150186, at *1 n.1 (S.D.N.Y. Apr. 29, 2009); <u>see also</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) (<u>pro se</u> complaint should be held to less stringent standard than formal pleadings drafted by counsel); <u>McPherson v. Coombe</u>, 174 F.3d 276, 280 (2d Cir. 1999) (pleadings should be

14

read liberally and interpreted to "raise the strongest arguments that they suggest")

(quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).  By the same token,

however, a pro se party's "bald assertion, completely unsupported by evidence," is not

sufficient to overcome a motion for summary judgment.  Pointdujour v. Mount Sinai

Hosp., 121 F. App'x 895, 898 (2d Cir. 2005) (quoting Carey v. Crescenzi, 923 F.2d 18,

21 (2d Cir. 1991)).

III.    Applicable Law

> In his complaint, Chinnery specifically alleges only that OCFS "retaliated"

against him in violation of Title VII and the New York State Human Rights Law.  (See

Compl. at 2).  As the factual basis for his retaliation claim, however, Chinnery further

alleges that he was "suspended without pay," "written up," "taken off the night tour,"

"harassed and disrespected," and "targeted for termination [by the] current

administration."  (Id. at 3).  Liberally construed, these allegations may be read to support

not only a retaliation claim, but also disparate treatment and hostile work environment

claims.  I therefore will address all three potential claims below, although in a different

order.

A.    Disparate Treatment

> Title VII provides that "[i]t shall be an unlawful employment practice for an

employer . . . to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin."
42 U.S.C. § 2000e-2(a)(1).

   To overcome a motion for summary judgment under Title VII, a plaintiff
must withstand the three-part burden-shifting framework of McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802-03 (1973).  Under that rubric, the plaintiff carries an initial
burden to "prov[e] by the preponderance of the evidence a prima facie case of
discrimination."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).
To establish a prima facie case, the plaintiff must show that:  (1) he fell within a protected
class under Title VII; (2) he was qualified for the position he held; (3) he was subjected to
an adverse employment action; and (4) the adverse action occurred under circumstances
giving rise to an inference of discrimination.  See Reynolds v. Barrett, 685 F.3d 193, 202
(2d Cir. 2012); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).

   Once the plaintiff makes out a prima facie case, "a rebuttable presumption
of discrimination arises and the burden then shifts to the defendant to articulate a
legitimate, non-discriminatory reason for the employment decision."  Sharpe v. MCI
Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quoting Stratton, 132
F.3d at 879).  The purpose of this step is "to force the defendant to give an explanation for
its conduct, in order to prevent employers from simply remaining silent while the plaintiff
founders on the difficulty of proving discriminatory intent."  Felder v. Securticus Sec.
Servs., No. 04 Civ. 9501 (LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006)
(quoting Fisher v. Vassar Coll., 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc)).

Finally, if the defendant provides a non-discriminatory rationale for its conduct, the rebuttable presumption dissipates and the burden shifts back to the plaintiff to prove that the proffered non-discriminatory reason was mere pretext for the otherwise discriminatory conduct.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93-94 (2d Cir. 2001).  In other words, the burden shifts back to the plaintiff to prove that "discrimination was the real reason for the employment action."  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In most cases there is a significant overlap among the three steps in the McDonnell Douglas framework.  Indeed, the question of whether the plaintiff has met his prima facie burden by demonstrating an inference of discrimination often is indistinguishable from the question of whether the employer's actions served merely as a pretext for some disguised discriminatory animus towards the plaintiff.  See Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *5 (S.D.N.Y. May 29, 2007).  In the end, "the bottom line in a Title VII summary judgment motion is, simply, whether plaintiff has presented sufficient evidence from which a reasonable trier of fact could determine that defendants discriminated against [him]."  Id.; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) ("Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, the ultimate burden of persuading the trier of fact that the defendant

17

intentionally discriminated against the plaintiff remains at all times with the plaintiff.")
(internal quotation marks omitted).

Chinnery alleges in his complaint that he suffered four separate adverse
actions because he was "written up," "taken off the night tour," "suspended without pay,"
and "targeted for termination."  (Compl. at 3).  During his deposition, Chinnery also
alleged that he and another Youth Division Aide were treated differently in 2010 when
they both returned from sick leave because Chinnery was interrogated regarding the
authenticity of his doctors' notes while the other Youth Division Aide was not.  (Dep. at
80-82).

Merely being "written up" does not qualify as an adverse employment action
under Second Circuit precedent.  See Weeks v. New York, 273 F.3d 76, 86 (2d Cir. 2001)
(issuance of "notice of discipline" and "counseling memo" does not qualify as adverse
employment action), abrogated on other grounds by Nat'l R.R. Passenger Corp. v.
Morgan, 536 U.S. 101 (2002).   Similarly, the "mere inconvenience" of being questioned
about his doctors' notes does not constitute an adverse employment action.  See Galabya
v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2010) ("To be 'materially adverse[,]'
a change in working conditions must be "more disruptive than a mere
inconvenience . . . .").[4]

---

[4]      Moreover, even if interrogation could qualify as an adverse employment action,
the only "evidence" of this form of alleged discrimination that Chinnery has adduced is
inadmissible hearsay.  (See Dep. at 82).

Turning to Chinnery's transfer to a different tour, a change in shift that is merely inconvenient generally does not rise to the level of an adverse employment action. See, e.g., Wilson v. N.Y. City Dep't of Trans., No. 01 Civ. 7398 (RJH), 2005 WL 2385866, at *16-17 (S.D.N.Y. Sept. 28, 2005) (denial of request to change shift not an adverse employment action); Booker v. Fed. Reserve Bank of N.Y., Nos. 01 Civ. 2290 (DC), 01 Civ. 2291 (DC), 2003 WL 123148, at *11 (S.D.N.Y. Mar. 17, 2003) ("Typically, lateral transfers or shift changes without a loss of pay or other material changes in working conditions do not constitute an adverse employment action."); Johnson v. Eastchester Union Free Sch. Dist., 211 F. Supp. 2d 514, 518 (S.D.N.Y. 2002) ("Johnson identifies his new hours and job location to be very inconvenient for him. Inconvenience by itself, however, does not constitute an adverse job action.").

The Second Circuit, however, has not ruled out the possibility that a shift change could rise to the level of an adverse employment action.  See Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002) (noting that "a shift assignment that makes a normal life difficult for the employee" may constitute an adverse employment action.  For example, in Cruz v. Liberatore, 582 F. Supp. 2d 508, 524 (S.D.N.Y. 2008), a judge in this District denied summary judgment, noting that "a transfer that affects a parent's ability to spend time with and care for a child" could, on a case-by-case basis, support a Title VII retaliation claim.  When he was deposed in this case, Chinnery testified that he "bid" for the overnight tour so that he could be "with [his] young kids" and that his prior tour assignment had been a "hardship."  (Dep. at 58-59).

I therefore will assume, for present purposes, that Chinnery's tour change constituted an adverse employment action.  In addition, Chinnery's suspension and eventual termination both unquestionably qualify as adverse employment events.  See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (holding that one-week suspension without pay constitutes adverse employment action); Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004) (plaintiff's termination constituted adverse employment action for purposes of retaliation claim).

Nevertheless, even if Chinnery suffered adverse employment actions, he failed to show that these events occurred under circumstances that would give rise to an inference of race or gender discrimination.  A plaintiff may raise an inference of discrimination by showing that his employer treated him "less favorably than a similarly situated employee outside his protected group."  Graham, 230 F.3d at 39.  To make such a showing, however, the plaintiff must demonstrate that he was "'similarly situated in all material respects' to the individuals with whom []he seeks to compare h[im]self."  Id. (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)).  As part of that analysis, the court must consider "whether the conduct for which the employer imposed discipline was of comparable seriousness."  Id. at 40 (internal citation omitted).

In an attempt to prove that he was disciplined more harshly because of his race and gender, Chinnery names four other Youth Division Aides whom he believes were similarly situated yet received more lenient treatment because they were not African-American men.  Chinnery's proposed comparators are Millicent Johnson, an

20

African-American woman; Peter Castelli, a white man; Enrique Rose, a Latino man; and Raphael Gomez, a "man of Spanish descent." (See Compl. at 13; Dep. at 72-73). Although OCFS concedes that none of these Youth Division Aides ever was suspended or terminated for failing to make census calls, the Census Call Logs demonstrate that their infractions were nowhere as severe as Chinnery's infractions. Chinnery missed three hundred and thirty-six census calls from February to December of 2007, during which time Johnson missed only seventy-two, Castelli missed only sixty, Rose missed only thirty-eight, and Gomez did not miss any census calls. Chinnery's compliance rate thus was more than four times worse than his closest alleged comparator. Given this difference, Chinnery cannot show that his comparators were similarly situated.[5]

       Furthermore, even if Chinnery were able to establish a prima facie disparate treatment claim, OCFS still would be entitled to summary judgment because (i) it has demonstrated clearly non-discriminatory reasons for changing Chinnery's shift and suspending and eventually terminating him from his position, and (ii) Chinnery has presented no evidence from which a reasonable juror could conclude that those reasons were pretextual. Through counseling and a series of progressive disciplinary steps, OCFS repeatedly cautioned Chinnery that his failure to make the required census calls would result in disciplinary action. (See, e.g., Rascoe Decl. ¶ 24; Exs. 10, 12, 14, 21).

---

[5]    Indeed, when he was questioned about the other employees during his deposition, Chinnery admitted that he could not say that Johnson missed an equivalent number of calls and that he was unsure how Gomez's treatment may have differed from his own treatment. (Dep. at 75-76, 79).

Absolutely nothing that occurred throughout OCFS' efforts to convince Chinnery to obey the rules suggests that OCFS' actions were motivated by Chinnery's race or gender rather than a concern for the Goshen residents.  Moreover, the record demonstrates that OCFS only terminated Chinnery's employment because he had not applied to be restored to duty following the expiration of his disability leave, as was required by the New York Civil Service Law.  (See Exs. 3, 4).  Once again, there is nothing to suggest that the rationale for OCFS' action was pretextual.

Accordingly, OCFS is entitled to summary judgment with respect to each of the disparate treatment claims Chinnery has raised.

B.     Retaliation

Title VII also makes it unlawful for an employer to retaliate against an employee who has engaged in protected activity such as filing formal discrimination complaints.  "To establish a prima facie case of unlawful retaliation under Title VII, an employee must show that (1) he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 698 (2d Cir. 2012) (internal quotation marks omitted).  Although the plaintiff need not show that his underlying discrimination claim has merit, id. (citing Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012)), a plaintiff claiming retaliation must show that the adverse action would not

have occurred but for the employer's retaliatory intent.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S. —, 133 S. Ct. 2517, 2533 (2013).

As with disparate treatment claims, the Second Circuit applies the McDonnell Douglas burden-shifting framework to retaliation claims.  Thus, if the plaintiff makes out a prima facie case of retaliation, a presumption arises and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action."  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  If the defendant can do so, "the presumption of retaliation dissipates."  Id.  The plaintiff then must show that the retaliatory act "would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Nassar, 133 S. Ct. at 2533; Zann Kwan v. Andalex Grp., LLC, 737 F.3d 834, 845 (2d Cir. 2013).  A plaintiff can satisfy this burden by demonstrating that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]."  Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

Liberally construed, the complaint alleges that OCFS unlawfully retaliated against Chinnery after he filed discrimination claims with EODD on January 8, 2008, and with the Division of Human Rights on May 22, 2008.  OCFS does not dispute that Chinnery engaged in protected activity by filing these complaints, nor does it dispute that his supervisors were aware of this activity.  In addition, OCFS concedes that the 2008

23

Notice of Discipline and Chinnery's eventual termination both qualify as "adverse employment actions" that may form the basis for a retaliation claim.[6]  But, as OCFS correctly contends, to prevail on his retaliation claim, Chinnery must demonstrate a causal connection between his protected activity and these two adverse employment actions. (ECF No. 73 (Def.'s Mem. of Law in Supp. of Mot. for Summ. J.) at 24 (citing Nassar, 133 S. Ct. at 2528)).   It is here that Chinnery's retaliation claims falter.

To establish the requisite causal connection between the filing of his administrative complaints and the adverse employment actions he suffered, Chinnery must show that OCFS would not have taken action but for his protected activity.  As the Second Circuit has made clear, when an adverse employment action is "part of an extensive period of progressive discipline" and "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001). That is precisely what occurred here.  The undisputed evidence establishes that OCFS began its disciplinary efforts long before Chinnery filed either of his administrative

---

[6]      To the extent that Chinnery claims that his brief paid suspension from December 27, 2007, to January 5, 2008, qualifies as an adverse employment action, it cannot form the basis of his retaliation claim since that suspension period began before Chinnery engaged in any protected activity.

In addition, Chinnery testified at his deposition that he was given an "unsatisfactory" rating in his 2007 annual review in retaliation for filing the EODD complaint. (Dep. at 38).  However, a "plaintiff's negative job evaluations alone do not establish an adverse employment action for purposes of [a] prima facie case."  Weeks, 273 F.3d at 86 (internal quotation marks omitted).

24

complaints.  Starting in early 2006, Chinnery's supervisors had repeatedly counseled him, both orally and in writing, of his need to improve his work performance.  (Rascoe Decl. ¶ 24).  Later that year, Chinnery was removed from the overnight shift because he had missed an excessive number of census calls.  Indeed, Chinnery received the 2007 Notice of Discipline and was suspended briefly from his job several days before he filed any administrative complaint.  Although the 2008 Notice of Discipline was issued after Chinnery filed his complaints, as in Slattery, it clearly was "part of an extensive period of progressive discipline" that began "well before" Chinnery's protected activity.  Chinnery therefore has not shown the requisite causal connection between his administrative complaints and any disciplinary actions against him.

In addition, Chinnery has not shown the requisite causal connection between his administrative complaints and his termination in 2010.   Courts in the Second Circuit consistently hold that "the passage of two or three months between the protected activity and the adverse employment action does not allow for an inference of causation." Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007).  In this case, more than two years elapsed between the filing of Chinnery's EODD and Division of Human Rights complaints and his termination.  Chinnery therefore plainly cannot demonstrate a causal connection based on temporal proximity alone.  More importantly, however, the record unambiguously demonstrates that Chinnery was terminated simply because he did not timely seek to return to work after taking disability leave due to a workplace assault.  (See Ex. 3).

25

In sum, because no reasonable juror could find a causal connection between Chinnery's administrative complaints and the 2008 Notice of Discipline or Chinnery's eventual termination, OCFS should be awarded summary judgment on Chinnery's retaliation claim.

C.    Hostile Work Environment

An employee also may suffer discriminatory treatment in violation of Title VII if required to work in a hostile or abusive environment.  See Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).  To prevail under this theory, a plaintiff must prove that (i) he subjectively perceived the environment to be abusive; (ii) his working environment was "objectively hostile" and (iii) a specific basis exists for imputing the hostile conduct to the employer.  See Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d Cir. 2000); Pronin v. Raffi Custom Photo Lab., Inc., 383 F. Supp. 2d 628, 633-34 (S.D.N.Y. 2005); O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 378, 385 (S.D.N.Y. 2001).  Mere "workplace bullying" is not enough to give rise to an actionable hostile work environment claim.  Rather, there must be a showing that the conduct occurred because of the employee's membership in a protected class.  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

To determine whether a work environment is "objectively hostile," a court must examine all of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

26

performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  "[H]arassment is

actionable . . . only if it is so severe or pervasive as to alter the conditions of [the victim's]

employment and create an abusive working environment."  Clark Cnty. Sch. Dist. v.

Breeden, 532 U.S. 268, 270 (2001) (quoting Faragher v. City of Boca Raton, 524 U.S.

775, 786 (1998)) (second brackets in original; internal quotations marks omitted).

Isolated incidents of harassment, unless "extremely serious," thus are not sufficient to

give rise to a hostile work environment claim.  See id. at 271; Howley, 217 F.3d at 153-

54; O'Dell 153 F. Supp. 2d at 386; see also Perry v. Ethan Allen, Inc., 115 F.3d 143, 149

(2d Cir. 1997) (incidents of harassment must be "more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive") (citing Carrero v.

N.Y.C. Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989)).

Chinnery's complaint alleges that he was "harassed and disrespected"

during his time with OCFS, but provides no supporting facts.  During his deposition,

however, Chinnery testified that there was an incident in 2008 in which one of his

supervisors threw paperwork down on a table, became "irate," slammed a door nearly

trapping Chinnery's hand, and later yelled at him to "do [his]" job and "came at" him.

(Dep. at 60-62).  Although Chinnery also testified that Rascoe and other supervisors sided

with the errant supervisor rather than with him, (id. at 62-64), this isolated incident

appears to be the sole basis in the record for Chinnery's allegation that he was "harassed

and disrespected."  As such, it plainly is insufficient to support a hostile work

environment claim.  Moreover, Chinnery has not adduced any evidence that this or any

other alleged workplace hostility occurred because of his race or gender.  OCFS

consequently is entitled to summary judgment with respect to this potential claim as well.

V.    Conclusion

For the reasons above, OCFS' motion for summary judgment, (ECF No.

71), should be granted and this case should be dismissed.

VI.    Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen (14) days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable Deborah A. Batts and to my chambers at the United

States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties.

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an

extension of time for filing objections must be directed to Judge Batts.  The failure to file

these timely objections will result in a waiver of those objections for purposes of appeal.

See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(d), 72(b).


Dated:       New York, New York
             April 25, 2014

                                                  FRANK MAAS
                                          United States Magistrate Judge

28

Copies to:

Honorable Deborah A. Batts
United States District Judge
(Via hand delivery)

Maurice Chinnery
22 Annan Street
Beacon, NY 12508
(Via U.S. Mail)

Helena Lynch
Assistant Attorney General
(Via ECF)